## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

NOVARTIS AG and GENENTECH, INC.,

        Plaintiffs,

v.

SHARx, LLC and CAMPBELL HEIGHTS PHARMACY LTD,

        Defendants.

Case No.

## COMPLAINT

Plaintiffs Novartis AG ("Novartis") and Genentech, Inc. ("Genentech") (collectively, "Plaintiffs") bring this Complaint for injunctive relief, disgorgement, and all other appropriate remedies against Defendants SHARx, LLC ("SHARx") and Campbell Heights Pharmacy Ltd. ("Campbell Heights Pharmacy") (collectively, "Defendants").  Plaintiffs allege as follows.

## NATURE OF THE ACTION

1.      In the United States, Genentech and Novartis work together to develop and co-promote a medicine called Xolair® for patients—including children—with severe, persistent allergic asthma, food allergies, and a number of similar respiratory conditions (the "U.S. Xolair® medicine").

2.      This case concerns Defendants' dangerous scheme to fill prescriptions for the U.S.  Xolair® medicine (among many other U.S. medicines) with illegally

imported medicines that have not been approved by the U.S. Food and Drug Administration ("FDA").

3. U.S. medicines are carefully regulated by the FDA to ensure their safety and efficacy. Biological medicines, like the U.S. Xolair® medicine, require particular care because their complex composition and sensitivity to variation in storage and handling conditions are susceptible to contamination and degradation that could undermine their safety and efficacy.

4. Patients who receive illegally imported and improperly handled medicines might believe they are sufficiently protected, when in fact they are not.

5. Defendant's unlawful scheme circumvents these regulations and the vital protections of Plaintiffs' secure supply chain, introducing risks of adverse events, serious patient injury, and even death.

6. Defendants' imported drugs have neither been approved by the FDA for use among the U.S. population nor subjected to Plaintiffs' carefully designed quality control measures, which ensure that the medicines are properly manufactured, packaged, stored, and shipped.

7. Defendants' evasion of proper regulation and monitoring renders insecure the U.S. supply chain that Plaintiffs' and the FDA have worked hard to protect, escalating the risk that counterfeits and dangerous drugs enter the United States.

8.     Genentech became aware of Defendants' scheme after being notified of Defendants' illegal importation of a product that appeared to be a version of the Xolair® medicine manufactured by Novartis and intended for sale in Canada (the "Canadian Xolair® medicine") in place of the FDA-approved U.S. Xolair® medicine.

9.     Genentech was contacted by medical staff at Allergy and Asthma Associates of Michigan who were confused over a shipment of the Canadian Xolair® medicine, did not understand why the packaging of the product looked different from the shipments the practice typically received, and had concerns over the legitimacy and quality of the product and the prescription.

10.     This confusion and uncertainty, which risks patient harm and dissatisfaction, is exactly what the Lanham Act, trademark law, and other related laws are designed to prevent.

11.     "A trademark designates the goods as the product of a particular trader and protects his good will against the sale of another's product as his.  It helps consumers identify goods and services that they wish to purchase, as well as those they want to avoid."  *Matal v. Tam*, 582 U.S. 218, 224 (2017) (cleaned up).  This protection serves to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).

12.     In the international context, these laws prohibit the sale of foreign versions of goods that are materially different from those sold by the trademark owner in the United States, even if the first sale of those trademarked goods was authorized by the trademark owner abroad.  In this context, even subtle differences increase the likelihood of confusion.

13.     Because Defendants have refused to cease their deceptive, confusing, and dangerous conduct, Plaintiffs have no choice but to bring this action. Defendants' unlawful, for-profit scheme constitutes trademark infringement, false designation of origin, and unfair competition under Sections 32, 42, and 43(a) of the Federal Trademark Act (the "Lanham Act"), 15 U.S.C. § 1114, 1124, 1125(a); deceptive and unfair trade practices under M.C.L.A. §§ 445.903, 445.911; and unfair competition and unjust enrichment under state and common law.

## PARTIES

14.     Plaintiff Novartis AG is a Swiss Aktiengesellschaft organized with a principal place of business at Lichstrasse 35, 4056, Basel, Switzerland.  Novartis owns the XOLAIR Marks, as defined below, used in connection with the U.S. Xolair® medicine and licenses those marks to Genentech.

15.     Plaintiff Genentech, Inc. is a Delaware corporation with a principal place of business at 1 DNA Way, South San Francisco, California 94080. Genentech is the exclusive distributor of U.S. Xolair® medicine.

4

16.     Defendant SHARx is a Missouri limited liability company with a principal place of business at 635 Maryville Centre Drive, Suite 200, St. Louis, Missouri 63141.  SHARx purports to provide "procurement and supply chain management solution[s] for high-cost prescription drugs,"[1] including by providing international drug sourcing services resulting in the substitution of patients' prescriptions for the U.S. Xolair® medicine with materially different Canadian Xolair® medicine.

17.     Defendant Campbell Heights Pharmacy is a pharmacy with a principal place of business at 2677 192 Street, Unit # 109, Surrey, British Columbia, V3S 3X1.  Campbell Heights Pharmacy is a Canadian pharmacy that has participated in the substitution of patients' prescriptions for the U.S. Xolair® medicine with materially different Canadian Xolair® medicine and has distributed materially different Canadian Xolair® medicine in the United States, including by shipping Canadian Xolair® medicine into Michigan as set forth below.

18.     Defendants have engaged in a scheme to substitute, misleadingly and without authorization from Plaintiffs, the U.S. Xolair® medicine with materially different Canadian Xolair® medicine for patients in, among other places, Macomb County, Michigan and Oakland County, Michigan.

---

[1] *Our Solution*, SHARx, https://sharxplan.com/our-solution/ (last visited Jan. 28, 2026).

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 15 U.S.C. §§ 1116 and 1121, and under 28 U.S.C. §§ 1331 and 1338 because this case arises under the trademark laws of the United States, 15 U.S.C. § 1051, *et seq.*

20.     This Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §§ 1338(b) and 1367(a), as well as under general principles of supplemental and pendant jurisdiction.

21.     Defendants are subject to personal jurisdiction within the Eastern District because they conduct business in this District.

22.     Defendant SHARx has facilitated obtaining materially different Canadian Xolair® medicine to patients or medical facilities in this District through the SHARx mail order program.  A true and correct copy of a SHARx mail order program prescription request form for a patient located in this District is attached as **Exhibit A**.

23.     Defendant Campbell Heights Pharmacy is a Canadian pharmacy that has shipped materially different Canadian Xolair® medicine to patients or medical facilities in this District on at least three occasions over approximately the past year (collectively, the "Michigan Incidents").

24.     Both Defendants have actively participated in the process of sourcing, delivering, or otherwise providing Canadian Xolair® medicine to patients in this District.

25.     Venue is proper under 28 U.S.C. § 1391(b)–(c) because Defendants conduct business in the Eastern District and a substantial part of the events or omissions giving rise to the claims, including Defendants' sourcing, delivering, or otherwise providing medicines for Michigan patients, occurred in this District.

## FACTS ENTITLING PLAINTIFFS TO RELIEF

### I.     Plaintiffs' Medicines and Marks

26.     The FDA's initial approval of the U.S. Xolair® medicine in 2003 for the treatment of moderate to severe persistent allergic asthma in certain patients marked an important milestone in work dating back to the 1980s.

27.     As a result of decades of work by Genentech researchers, patients across the country who have been plagued by uncontrolled wheezing and difficulty breathing have been granted some modicum of relief.

28.     Plaintiffs have invested, and continue to invest, tremendous resources in developing the U.S. Xolair® medicine and ensuring that it meets the highest standards of quality for patients.

29.     This includes manufacturing, packaging, and labeling the medicine in accordance with the FDA-approved New Drug Application ("NDA") for the U.S. Xolair® medicine.

30.     As part of its NDA submission for the U.S. Xolair® medicine, Genentech provided a detailed account of the manufacturing, packaging, and labeling process to ensure that the U.S. Xolair® medicine complies with all requirements of the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and corresponding regulations.

31.     These regulations and the NDA address how products are to be designed and distributed for sale in the United States, not in foreign countries.

32.     Novartis is the owner and Genentech is the exclusive licensee in the United States of the following well-known, registered trademarks, along with their underlying common law rights, that appear on the U.S. Xolair® medicine and in related marketing and advertising materials (collectively the "XOLAIR Marks"):

| Trademark | Registration Number | Registration Date | Goods |
|---|---|---|---|
| XOLAIR | 2,998,978 | Sept. 20, 2005 | Pharmaceutical preparations for use in the treatment of asthma |
| XOLAIR | 3,086,141 | Apr. 25, 2006 | Pharmaceutical preparations for the treatment of IgE-mediated disorders |
| Xolair | 4,590,913 | Aug. 26, 2014 | Pharmaceutical preparations for the prevention and treatment of urticaria |

| Trademark | Registration Number | Registration Date | Goods |
|---|---|---|---|
| XOLAIR | 4,918,470 | Mar. 15, 2016 | Pharmaceutical preparations for the treatment of urticaria |
| XOLAIR | 5,766,518 | June 04, 2019 | Pharmaceutical preparations for the treatment and prevention of severe allergic reactions following exposure to an allergen |
| **Xolair** | 5,809,618 | July 23, 2019 | Pharmaceutical preparations for the treatment and prevention of severe allergic reactions following exposure to an allergen |
| XOLAIR | 7,094,379 | June 27, 2023 | Pharmaceutical preparations for the treatment of chronic rhino sinusitis with nasal polyps |

True and correct copies of the registration certificates for the XOLAIR Marks are attached as **Exhibit B**.

33.    Pursuant to 15 U.S.C. § 1057(b), the registration certificates for the XOLAIR Marks constitute *prima facie* evidence of the validity of the registered marks and of the registration of the marks, of Novartis's ownership of the trademarks set forth therein, and of Novartis's exclusive right to use or license those trademarks in commerce on or in connection with the goods specified in the registration certificates.

34.    Pursuant to 15 U.S.C. § 1065, Registration Numbers 2,998,978; 3,086,141; 4,590,913; 4,918,470; 5,766,518; and 5,809,618 are incontestable.

9

35.     The XOLAIR Marks have been used in connection with the U.S.

Xolair® medicine for more than two decades and have consistently appeared on the

packaging for the U.S. Xolair® medicine.

36.     Genentech supplies millions of units of the U.S. Xolair® medicine

bearing the XOLAIR Marks to patients across the country each year.

37.     Below are representative images of the packaging for a 150 mg/mL

single-dose prefilled syringe of the U.S. Xolair® medicine:





10







38.     Over the years, Genentech has extensively marketed and promoted the

U.S. Xolair® medicine using the XOLAIR Marks, including through advertising on

television, social media, internet forums, and healthcare provider materials.

39.     The U.S. Xolair® medicine has received extensive national

recognition, including in feature stories in major newspapers and television shows.[2]

40.     Through Genentech's continuous advertising, promotion, and sale of

medicines across the United States under the XOLAIR Marks, those trademarks

have acquired value in the United States.

41.     As a result of these efforts, the XOLAIR Marks are widely recognized

by patients and practices across the country and have acquired extensive goodwill

as trademarks identifying high-quality medicines patients know and trust.

## II.     Material Differences Between the U.S. Xolair® Medicine and the Canadian Xolair® Medicine

42.     The U.S. Xolair® medicine is manufactured, packaged, and labeled in

accordance with Genentech's FDA-approved U.S. NDA for that product.

43.     This FDA approval depends on multiple aspects of the U.S. Xolair®

medicine, including the composition of the drug product itself, the manufacturing

---

[2] *See, e.g.*, Geoff Bennett, *Trials Show Asthma Drug Helps Reduce Allergic Reactions to Certain Foods*, PBS NEWS (Feb. 26, 2024), https://www.pbs.org/newshour/show/trials-show-asthma-drug-helps-reduce-allergic-reactions-to-certain-foods; Amanda Musa, *New Data Shows Asthma Medicine May Help Reduce Severe Reactions in People with Multiple Food Allergies*, CNN HEALTH (Feb. 27, 2024), https://www.cnn.com/2024/02/25/health/xolair-asthma-food-allergy-study/index.html; William A. Haseltine, *Breathe Easier: How Science Is Uncovering the Mysteries of Allergies*, FORBES (Mar. 3, 2024), https://www.forbes.com/sites/williamhaseltine/2024/03/03/breathe-easier-how-science-is-uncovering-the-mysteries-of-allergies/?sh=34fc79121bdb.

process, and the labeling.  Accordingly, each of these aspects is fundamental to the approval of the U.S. Xolair® medicine and its distribution in U.S. commerce.[3]

44.     The Canadian Xolair® medicine, like all non-U.S. Novartis and Genentech medicines, is not intended for sale in the United States, and is not regulated or approved by the FDA for use in the United States.

45.      The Canadian Xolair® medicine is materially different from the FDA-approved U.S. Xolair Medicine® in many respects.

## *Quality Control Differences*

46.     Critically for patient safety, Genentech and Novartis require and implement strict quality-control standards for the manufacture, packaging, and distribution of the U.S. Xolair® medicine.  U.S. patients recognize the XOLAIR Marks and understand that they indicate the U.S. Xolair® medicine that they receive is genuine, high quality, securely manufactured, and securely distributed.

47.     But Defendants' unlawful importation scheme creates at least the following differences from the quality-control procedures normally assured for consumers of the U.S. Xolair® medicine.

48.     *First*, Genentech's strict shipping and temperature protocols for the U.S. Xolair® medicine cannot be followed under Defendants' unlawful importation scheme.

_____

[3] *See* 21 U.S.C. § 355(a)–(b).

49. The required shipping and storage temperature range for the U.S. Xolair® prefilled syringe and autoinjector is 36° to 46° Fahrenheit (2° to 8° Celsius). The prefilled syringe and autoinjector cannot be left out of the refrigerator for more than two days and cannot be used if left at temperatures above 77° Fahrenheit (25° Celsius).

50. The U.S. Xolair® vial must similarly be stored under refrigerated conditions of 36° to 46° Fahrenheit (2° to 8° Celsius), but should be shipped at controlled ambient temperature (≤86°Fahrenheit ≤30°Celsius).

51. The U.S. Xolair® medicine is shipped to a receiving center in Kentucky before it is released to patients or healthcare practitioners. There, a shipping document shows whether the medicine was exposed to temperatures outside of acceptable excursion levels. If so, the medicine is tested before being released.

52. Novartis operates a supply chain that ensures product remains at its regulatory required temperature range by utilizing validated temperature-controlled technologies. Regulatory authorities in many countries such as the United States and Canada require responsible parties within the supply chain to maintain quality controls. It is unknown whether the network used by Defendants maintains required quality controls as mandated by Health Canada and the FDA.

53.     Genentech's and Novartis's quality control protocols cannot be followed when product is shipped from Canada by parties not within Genentech's or Novartis' control.

54.     Unregulated international shipping of sterile biological products like the U.S. Xolair® medicine introduces substantial risks.

55.     Sterile drugs are susceptible to contamination and degradation.  These risks are particularly acute for biological products, like the U.S. Xolair® medicine, due to their complex composition and sensitivity to variation in storage and handling conditions.

56.     This can result, for example, in the introduction of contaminants, deterioration of the active ingredient, or other product degradation, which in turn can inhibit the efficacy of the medicine leading to reduced or no protection, and lead to adverse events, serious patient injury, and even death.

57.     Even under the best of conditions, international shipping routes regularly take longer than two days and exceed 77° Fahrenheit, elevating the risks above.

58.     In the Michigan Incidents, for example, the unlawfully imported shipments had to travel over 2,400 miles from Surrey, British Columbia to Royal Oak and Sterling Heights, Michigan, likely taking several days of driving.

59.     Indeed, a recent study of entities engaged in similar unlawful importation found that the procurement of medicines from abroad, among other factors, regularly results in negative patient impacts.  Compared to authorized channels, unlawful importation resulted in patients receiving treatment 3.4 times slower, facing a treatment gap due to a delayed refill 47 times more often, and suffering poor clinical outcomes 9.2 times more often.[4]

60.     Without continuous visibility into the shipping conditions for Defendants' unlawfully imported products, patients cannot be guaranteed that established quality-control procedures have been followed, and Plaintiffs are deprived of their ability to control the conditions under which the Xolair® product sold in the United States is shipped and distributed.

61.     *Second*, proper product recall protocols for the U.S. Xolair® medicine cannot be employed.

62.     Plaintiff Genentech works with a network of authorized distributors in the United States, some of which ship directly to pharmacies.

63.     If there are any quality issues with a particular lot of medicine, Genentech's Channel Distribution team works to pin down the cause and prevent

---

[4] Karen Blum, *AFPs Affect Access to Specialty Medications*, SPECIALTY PHARMACY CONTINUUM (Oct. 30, 2025), https://www.specialtypharmacycontinuum.com/Online-First/Article/10-25/AFPs-Affect-Access-to-Specialty-Medications/78765.

potential harm to patients. In the event of a recall, Genentech would issue the recall to their network of authorized distributors in the market to which Plaintiffs know the affected lot was distributed.

64. Absent Defendants' unlawful importation scheme, any recall associated with a quality concern with a lot of the Canadian Xolair® medicine would trigger the issuance of a targeted recall in Canada only, whereas any recall associated with a quality concern with a lot of the U.S. Xolair® medicine would trigger the issuance of a targeted recall in the United States only.

65. But because of Defendants' unlawful importation scheme, if there were to be a recall on the Canadian Xolair® medicine, U.S. patients taking the diverted Canadian Xolair® medicine would not be notified and would be vulnerable to the health risks associated with receiving adulterated or otherwise unsafe or ineffective medicine.

66. Further, if there were to be a recall of the Canadian Xolair® medicine, Plaintiffs likely would not have enough information to address this issue via a recall in the United States. Even if Plaintiffs were to issue a recall notice in the United States regarding a lot of the Canadian Xolair® medicine, such a notice would inevitably lead to confusion among U.S. patients receiving medicine through authorized U.S. channels, who are likely to believe, erroneously, that their medicine is affected by the recall. Over a longer time period, U.S. patients who

17

come to realize the recall does not apply to them would likely start to pay less attention to recall notices, potentially leading them to ignore a recall that actually applies to them in the future.

### *Physical Differences*

67.     There are also many physical differences between the U.S. and Canadian medicines that would be visible to patients and medical providers, leading inevitably to confusion.

68.     *First*, shipments of the U.S. Xolair® medicine include a temperature tag, which tracks temperature over the course of shipment to ensure that the medicines have been kept within the necessary temperature range.  That U.S. temperature tag looks nothing like the tag included in the unauthorized imports in the Michigan Incidents, or even used within Canada for authorized shipments of Canadian Xolair® medicine.



| Temperature Tag for U.S. Xolair® Medicine | | |



| | |
|---|---|
| Temperature Tag Used Within Canada for Authorized Canadian Xolair® Medicine | |
| Temperature Tag Used by Defendants for Canadian Xolair® Medicine Received by Allergy & Asthma Associates of Michigan | |

69.     Patients and medical providers accustomed to the U.S. tag will generally not be able to use either of the Canadian versions to determine whether the necessary range was maintained, thus introducing risk of serious adverse events.

70.     *Second*, the U.S. Xolair® medicine's insert bears prescribing information, common adverse reactions, or limitations of use, which are absent from the Canadian Xolair® medicine's labeling.  Importantly, the U.S. Xolair® medicine's insert reflects that it is indicated for the treatment of food allergy, which is not the case for the Canadian Xolair® medicine.  Patients with serious food allergies therefore may be confused as to whether or not they are actually protected

19

or may mistakenly believe that they have been exposed to added risk from their

past use of their prescribed medicines.

| | |
|---|---|
| U.S. Xolair® Medicine | **What is XOLAIR?**<br>XOLAIR is an injectable prescription medicine used to treat:<br>• moderate to severe persistent asthma in people 6 years of age and older whose asthma symptoms are not well controlled with asthma medicines called inhaled corticosteroids. A skin or blood test is performed to see if you have allergies to year-round allergens. It is not known if XOLAIR is safe and effective in people with asthma under 6 years of age.<br>• chronic rhinosinusitis with nasal polyps (CRSwNP) in people 18 years of age and older when medicines to treat CRSwNP called nasal corticosteroids have not worked well enough. It is not known if XOLAIR is safe and effective in people with CRSwNP under 18 years of age.<br>• food allergy in people 1 year of age and older to reduce allergic reactions that may occur after accidentally eating one or more foods to which you are allergic. While taking XOLAIR you should continue to avoid all foods to which you are allergic. It is not known if XOLAIR is safe and effective in people with food allergy under 1 year of age.<br>• chronic spontaneous urticaria (CSU, previously referred to as chronic idiopathic urticaria (CIU), chronic hives without a known cause) in people 12 years of age and older who continue to have hives that are not controlled with H1 antihistamine treatment. It is not known if XOLAIR is safe and effective in people with CSU under 12 years of age.<br>XOLAIR should not be used for the emergency treatment of any allergic reactions, including anaphylaxis. XOLAIR should also not be used to treat other forms of hives, or sudden breathing problems. |
| Canadian Xolair® Medicine | **What is Xolair used for?**<br>**Asthma**<br>Adults and adolescents 12 years of age and older:<br>Xolair (omalizumab) is a prescription medicine that has been shown to significantly decrease the incidence of asthma exacerbations and improve control of asthma symptoms in people who:<br>• Are 12 years of age and above<br>• Have moderate to severe persistent asthma. This means they have 1 or more of the following:<br>  - Asthma symptoms every day<br>  - Daily need for a rescue inhaler<br>  - 2 or more asthma attacks a week |

71.     *Third*, among other warnings and precautions, the U.S. Xolair®

medicine's box label and internal blister packaging bear the following prominent

warning: "**Do not** use for emergency treatment." The Canadian Xolair®

medicine's box label and internal blister packaging do not include this warning.

This warning carries particular importance given the U.S. Xolair® medicine's

approval for the treatment of food allergy since that indication *does not extend to*

*emergency treatment of acute food allergies*.  The absence of this warning on the

Canadian labeling can therefore have particularly severe consequences for U.S.

patients interested in the treatment of their food allergies.

| | |
|---|---|
| U.S. Xolair® Medicine |  |
| Canadian Xolair® Medicine | |

72.     *Fourth*, the U.S. Xolair® medicine's box label and internal blister packaging bear the drug's 10-digit National Drug Code ("NDC") and corresponding barcode, as required by FDA regulations.  The Canadian Xolair® medicine's box label and internal blister packaging bear a 12-digit Canadian Drug Identification Number ("DIN") and corresponding barcode, but do not include an NDC.  The NDC is used in the United States for various functions, including when identifying products in product recalls and for billing purposes.



| Canadian Xolair® Medicine |  |

73. *Fifth*, as shown in the above images, the U.S. Xolair® medicine's box label and internal blister packaging are only in English, while the Canadian Xolair® medicine's box label and internal blister packaging include French language.

74. *Sixth*, the U.S. Xolair® medicine's insert includes a Medication Guide, which is patient labeling that is required by U.S. Regulation to accompany the dispensing of any prescription medicine where FDA has determined that it could help prevent serious adverse reactions; the drug has serious risk(s) (relative to benefits) of which patients should be made aware because information concerning

the risk(s) could affect patients' decision to use, or to continue to use, the product; or patient adherence to directions for use is crucial to the drug's effectiveness.[5]

75.     The FDA sets rigorous and precise standards as to the wording, presentation, font, and content of Medication Guides which are an essential component of FDA's Risk Management efforts.

76.     Among other information, the Medication Guide explains that, as noted above, the U.S. Xolair® medicine should not be used for the emergency treatment of any allergic reactions, including anaphylaxis, and should not be used to treat other forms of hives or sudden breathing problems.  The Canadian Xolair® medicine's patient-directed information does not include this warning and reflects a different description of safety information as determined by Canada's health authority.

---

[5] *See* 21 C.F.R. pt. 208.

| | |
|---|---|
| U.S. Xolair® Medicine | **5.8    Laboratory Tests**<br>Serum total IgE levels increase following administration of XOLAIR due to formation of XOLAIR:IgE complexes *[see Clinical Pharmacology (12.2)]*. Elevated serum total IgE levels may persist for up to 1 year following discontinuation of XOLAIR. Do not use serum total IgE levels obtained less than 1 year following discontinuation to reassess the dosing regimen for asthma, CRSwNP or IgE-mediated food allergy patients, because these levels may not reflect steady-state free IgE levels *[see Dosage and Administration (2.2, 2.3, 2.4)]*.<br><br>**5.9    Potential Medication Error Related to Emergency Treatment of Anaphylaxis**<br>XOLAIR should not be used for the emergency treatment of allergic reactions, including anaphylaxis. In studies to simulate use, some patients and caregivers did not understand that XOLAIR is not intended for the emergency treatment of allergic reactions, including anaphylaxis. The safety and effectiveness of XOLAIR for emergency treatment of allergic reactions, including anaphylaxis, have not been established. Instruct patients that XOLAIR is for maintenance use to reduce allergic reactions, including anaphylaxis, while avoiding food allergens. |
| Canadian Xolair® Medicine | **Monitoring and Laboratory Tests**<br><br>Serum total IgE levels increase following administration of Xolair due to formation of omalizumab:IgE complexes (See 10 CLINICAL PHARMACOLOGY and 4 DOSAGE AND ADMINISTRATION). Elevated serum total IgE levels may persist for up to 1 year following discontinuation of Xolair. Serum total IgE levels obtained less than 1 year following discontinuation may not reflect steady state free IgE levels and should not be used to reassess the dosing regimen in asthma patients.<br><br>**Renal**<br><br>Xolair therapy has not been studied in patients with pre-existing renal impairment. Caution should be exercised when administering Xolair in these patient populations.<br><br>- 1 or more nights a week waking up with asthma symptoms<br>- below-normal reading (less than 80%) from a tool called a peak flow meter, which measures how well the lungs work<br>• Have asthma that is triggered by year-round allergens in the air, which is confirmed by a doctor using a simple skin or blood test. This is known as allergic asthma<br>• Continue to have asthma symptoms even though they are taking inhaled steroids<br>Children 6 to less than 12 years of age:<br>Xolair, used as add-on therapy, has been shown to significantly decrease the rate of asthma exacerbations for children who are 6 to less than 12 years of age with moderate to severe persistent allergic asthma who continue to have asthma symptoms even though they are taking inhaled steroids and have a documented history of asthma exacerbation.<br><br>**Chronic Rhinosinusitis with Nasal Polyps (CRSwNP)**<br>Xolair is used to treat adults (18 years of age and older) with chronic rhinosinusitis with nasal polyps (CRSwNP) whose disease is not well controlled with their current CRSwNP medicines. Xolair helps reduce the size of the polyps and improves symptoms caused by CRSwNP including nasal congestion, loss of sense of smell, post-nasal drip and runny nose.<br><br>**Chronic Idiopathic Urticaria (CIU)**<br>Xolair (omalizumab) is a prescription medicine to treat Chronic Idiopathic Urticaria (CIU) in adults and adolescents (12 years of age and older) whose symptoms are not well controlled with antihistamines. Xolair provides relief of CIU symptoms such as skin itch and hives. |

77.    *Seventh*, the U.S. Xolair® medicine's box label and internal blister packaging include the following storage instructions, respectively:

"Refrigerate at 2°C to 8°C (36°F to 46°F) in the original carton. Protect from direct sunlight. Do not freeze. The carton can be removed from and placed back in the refrigerator if needed. The total combined time out of the refrigerator may not be more than 2 days. Do not use if carton left at temperatures above 25°C (77°F)."

"Refrigerate at 2°C to 8°C (36°F to 46°F) in the original carton. Protect from direct sunlight. Do not freeze."

| | |
|---|---|
| U.S. Xolair® Medicine |  |
| Canadian Xolair® Medicine | |



78. The Canadian Xolair® medicine's box label provides a related instruction, but in French in addition to English, with less information, and with the temperature listed only in Celsius, not in Fahrenheit. The Canadian Xolair® medicine's internal blister packaging does not include such an instruction at all.

79. *Eighth*, the U.S. Xolair® medicine's box label bears the GENENTECH word mark alongside the NOVARTIS word & design mark, while its internal blister packaging identifies the product as "Manufactured by: Genentech, Inc." The Canadian Xolair® medicine's box label bears only the NOVARTIS word mark and design mark, while its internal blister packaging includes the NOVARTIS word mark and design mark, with no mention of Genentech.





80.     Patients and medical practices would naturally notice—and, as discussed below, have in fact noticed—these differences when presented with the Canadian Xolair® medicine instead of the U.S. Xolair® medicine.

81.     Many consumers encountering these differences will inevitably face concerns about whether the medicine is authentic, whether they have received the wrong medicine, and whether they can safely use the medicine.

82.     These concerns may be particularly heightened, as in the case of the Michigan Incidents, where the temperature tag included in the shipment is of an entirely different type than in an authorized shipment of the U.S. Xolair® medicine

and effectively unusable to confirm that the medicine has been kept in the necessary temperature range during shipment.

83.    These concerns threaten the goodwill associated with XOLAIR Marks and the hard-earned trust that consumers have built up on the U.S. Xolair® medicine, all to the detriment of Plaintiffs.

84.    These differences are likely to cause confusion among patients who are unsure about the source, provenance, or legitimacy of medicines bearing unexpected differences from the U.S. Xolair® medicine they know.

### III.    Ongoing Confusion Among Patients and Practices

85.    Health care providers and staff at two different locations of the Allergy & Asthma Associates of Michigan—the Sterling Heights practice and the Royal Oak practice—have reported their confusion after receiving the Canadian Xolair® medicine instead of the U.S. Xolair® medicine.

86.    The first case involves a patient at the Sterling Heights practice, and the second case involves a patient at the Royal Oak practice.

87.    In the *first* case, in December 2024, the Sterling Heights practice received a "Prescription Request From SHARx Mail Order Program," which instructed the practice to send an e-prescription for "Xolair – 90 day supply with 3 refills" to a "University Pharmacy" in Coral Gables, Florida 33134.



**Medications:** Xolair - 90 day supply with 3 refills

**Please send an e-prescription to:**

University Pharmacy
Coral Gables, FL 33134

NCPDP:
1144871245

NPI:
1639247513

88.  The Sterling Heights practice followed these instructions and sent the patient's prescription to University Pharmacy ("SHARx E-Prescription").

89.  In or around December 2024, the Sterling Heights practice received a delivery with that patient's SHARx E-Prescription from Campbell Heights Pharmacy.

90.  A professional at the Sterling Heights practice was confused by this shipment and did not understand why the packaging of this delivery looked different from the shipments the practice typically receives.  The employee observed in particular that the packaging did not bear an NDC, but instead an unfamiliar DIN and lot number, and was written partially in French.

91.  In the *second* case, in or around February 2025, the Allergy & Asthma Associates of Michigan's Royal Oak practice received a delivery on behalf of a patient who had been prescribed the U.S. Xolair® medicine.

92.  As in the Sterling Heights case, an employee of the practice was confused by this shipment and did not understand why the packaging of this delivery looked different from the shipments the practice typically receives.  The

employee observed in particular that the packaging did not bear an NDC, but instead an unfamiliar DIN and lot number, and was written partially in French.

93.    The practice was concerned as to whether the medicine was legitimate, whether it was in fact the correct medicine prescribed by Royal Oak practice physicians, and whether administering this product posed any risk to the patient's health.

94.    The practice was also confused as to whether and how one could enter an NDC number in order to obtain reimbursement for administering this product, given that the face of the packaging contained no NDC.

95.    In photos of the product taken by an employee of the Royal Oak practice, there is a sticker affixed to the carton that reads, "CAMPBELL HEIGHTS PHARMACY," alongside the pharmacy's British Columbia, Canada address and telephone number.



96.    The Royal Oak practice employee contacted Genentech regarding these concerns.  Based on a review of photos of the product sent by the practice,

Genentech determined that the product was Novartis-branded Canadian Xolair®

medicine that appeared to have been sourced from Campbell Heights Pharmacy.

97. The physician listed as the prescribing physician on the packaging

from Campbell Heights Pharmacy is an individual identified as "Dr. Sood, Shahil

H."

98. Dr. Sood has no connection or affiliation with Allergy and Asthma

Associates of Michigan, and, on information and belief, has no physician-patient

relationship with any patient at Allergy and Asthma Associates of Michigan.

99. Instead, Dr. Sood appears to be a hair transplant physician affiliated

with Hasson & Wong Aesthetic Surgery Center based in Vancouver, British

Columbia, Canada.[6]

100. Dr. Sood's listed credentials do not reflect any training, expertise, or

experience in the treatment of the medical conditions for which the U.S. Xolair®

medicine is indicated.

101. Defendants' reliance on a doctor with no relevant expertise[7] and with

no physician-patient relationship with the patient heightens the risk to patient

safety and the likelihood of confusion.

---

[6] *See Dr. Shahil Sood*, Hasson & Wong, https://hassonandwong.com/dr-shahil-sood-hair-transplant-surgeon/ (last visited Jan. 28, 2026).

[7] Notably, insurance policies for the U.S. Xolair® medicine regularly require the prescription to be written by an allergist, immunologist, or pulmonologist in order to be approved. *See, e.g.*, *UnitedHealthcare Pharmacy Clinical Pharmacy* (continued…)

102. Particularly without relevant expertise, such a doctor is ill-equipped, for example, to evaluate the safety of substituting a Canadian drug in place of the prescribed U.S. medicine, ensure that the specialized medicine is properly handled and shipped to the U.S. patient, or respond to questions or concerns that the patient may raise via the contact information listed on the shipment.

103. Dr. Sood is highly unlikely to have this important expertise.

104. On receipt of this shipment, the Royal Oak practice employee attempted to contact Campbell Heights Pharmacy, but was unable to speak to anyone who could answer her questions or address her confusion.

105. The Royal Oak practice employee then contacted SHARx, which the employee understood to have facilitated the shipment of the Canadian Xolair® medicine from Campbell Heights Pharmacy. The employee spoke to a representative of SHARx, who confirmed involvement in the procurement of the Canadian Xolair® medicine; reassured the employee that it was "ok"; and characterized Campbell Heights Pharmacy as a "specialty pharmacy" from which SHARx is sourcing the patient's medicine. The SHARx representative also

---

*Programs: Xolair*, at 1-3 (effective July 1, 2025) https://www.uhcprovider.com/content/dam/provider/docs/public/prior-auth/drugs-pharmacy/commercial/r-z/PA-Med-Nec-Xolair.pdf ("Xolair will be approved based on . . . **[a]ll** of the following: Diagnosis of moderate to severe asthma **-AND-** . . . [p]rescribed by **one** of the following: i. Allergist ii. Immunologist iii. Pulmonologist[.]").

assured the Royal Oak practice employee that they had communicated directly with the patient about the situation.

106.   Due to its concerns about the legitimacy and safety of this atypical product, the practice decided not to administer the Canadian Xolair® medicine, and to instead administer a dose of the U.S. Xolair® medicine from the practice's own stock of sample product.

107.   These instances are representative of the concerns that patients and practices will inevitably encounter when receiving unlawfully imported Canadian Xolair® medicine in place of properly prescribed U.S. Xolair® medicine, undermining the goodwill associated with the XOLAIR Marks by causing consumers to question the quality, safety, and efficacy of the Plaintiffs' medicines.

108.   On information and belief, Defendants have continued their shipments of the Canadian Xolair® medicine in place of the U.S. Xolair® medicine to both the Sterling Heights and Royal Oak practices.

## IV.   Defendants' Scheme to Import and Pass Off Foreign Medicines in Place of FDA-Approved Medicines

109.   Defendants have conspired to execute a scheme whereby American patients, who have commercial health insurance and are entitled to have their prescriptions filled by authorized, FDA-approved U.S. medications, are instead required, tricked, or pushed into filling their prescriptions with illegally-imported,

unauthorized, non-FDA-approved foreign medicines, such as Canadian Xolair®
medicine.

110.   Defendants all knew, and certainly had every reason to know, that
imported Canadian Xolair® medicine is not FDA-approved and has numerous
material differences from the FDA-approved U.S. Xolair® medicine.

111.   The FDA has stated, including through public warnings to various
businesses, that the importation of drugs from other countries as substitutes for
FDA-approved drugs is illegal and "poses significant health risks to U.S.
consumers," including because "[m]edicines from outside the legitimate U.S. drug
supply chain do not have the same assurance of safety, effectiveness, and quality as
drugs subject to FDA oversight."[8]  Given these concerns, the FDA has also seized
medications shipped under similar circumstances, where a business "substitutes the
FDA-approved drugs prescribed the U.S. healthcare provider with unapproved
drugs."[9]

---

[8] *See, e.g.*, Scott Zamost *et al*, *Cheaper Medicines, Free Beach Trips:  U.S. Health
Plans Tap Prescriptions That Feds Say Are Illegal*, CNBC (last updated Nov. 14,
2025), https://www.cnbc.com/2025/11/13/employer-health-plans-afp-prescriptions-
feds-illegal.html.

[9] *Id.*

112.    Representatives of Homeland Security have echoed similar concerns in public statements, such as by concluding, "No patient, no American should ever have to be forced to take a medication that's going to put their life at risk."[10]

113.    So, too, has the U.S. House Appropriations Committee, stating earlier this year that it has "deep concern over the health risks posed by illegal importation of unapproved and misbranded drugs."[11]

114.    The Department of Justice has also found that in some instances, unlawful importation of putatively authentic medicines may be used as a ruse for the importation and sale of counterfeit drugs with no active ingredients whatsoever.[12]

115.    Further, Plaintiff Genentech notified Defendant SHARx of its illegal conduct in a letter dated May 16, 2025.

116.    Defendant SHARx failed to respond.

117.    Plaintiff Genentech again notified Defendant SHARx of its illegal conduct in a follow-up letter dated July 31, 2025.

---

[10] *Id.*

[11] *Id.*

[12] Department of Justice, *Canadian Drug Firm Admits Selling Counterfeit and Misbranded Prescription Drugs Throughout the United States* (Apr. 13, 2018), https://www.justice.gov/usao-mt/pr/canadian-drug-firm-admits-selling-counterfeit-and-misbranded-prescription-drugs.

118.   In a letter dated August 4, 2025, Defendant SHARx refused to change any aspect of its illegal conduct.

119.   In January 2026, Plaintiff Genentech reiterated that SHARx must cease its illegal conduct.

120.   During a phone call with Genentech on January 29, 2026, SHARx reiterated that its prior position has not changed and thus has no intention of discontinuing its illegal conduct.

121.   SHARx continues to brazenly deceive patients into believing they are receiving the same safe, securely supplied medicines that they would receive from a U.S. retail pharmacy.

122.   Because the Canadian Xolair® medicine is materially different, for the reasons detailed herein, from the authorized U.S. Xolair® medicine, the importation, distribution and sale of the Canadian Xolair® medicine in the United States is, *inter ali*a, an act of trademark infringement.

123.   SHARx coordinates this unlawful international sourcing scheme.

124.   SHARx is a self-described "procurement and supply chain management solution for high-cost prescription drugs."[13]

---

[13] *Our Solution*, SHARx, https://sharxplan.com/our-solution/ (last visited Jan. 28, 2026).

125.   SHARx works with employers who have employer-sponsored health plans to help source specialty and high-cost drugs for patients enrolled in their employer-sponsored health plans.

126.   SHARx sources those specialty and high-cost drugs through various methods, including through pharmaceutical manufacturers' patient assistance programs, co-pay assistance programs, and, as is most relevant here, importation of foreign medicines.

127.   Many of the medicines SHARx sources come from Canada.

128.   SHARx advertises to its partners and to patients that it will source several of Plaintiffs' or their related companies' branded U.S. medicines, including the Actemra®, Avastin®, Ocrevus®, Pulmozyme®, and U.S. Xolair® medicine.[14]

---

[14] *See, e.g.*, Stark Cnty. Bd. of Comm'rs, *Health Benefits 2026 Enrollment Guide*, at 10 (2026), https://cms7files1.revize.com/starkcountyoh/Stark%20County%20Benefits%20Guide%202026.pdf??t=202601221351250&t=1769108162842&?t=202601221351250&t=1769108162842.



We are excited to announce a new program, SHARx, that is provided to employees who are enrolled in our medical plan.  The SHARx program was created to help source specialty medications at a reduced cost. With the assistance from the SHARx program, members typically have reduced out of pocket costs for their specialty medications each month. Providing the SHARx program means that all specialty medications are no longer covered when using your insurance card at your specialty pharmacy.

**What is SHARx?**
SHARx is an advocacy solution provided by the County. This program was created to extend advocacy program benefits to employees like you. Their role is to help facilitate the advocacy process for each eligible member of the County's health plan and provide access for all specialty medications.

**What is considered a Specialty Prescription?**
Any medication that is high complexity, high touch and usually over $1000 for a 30-day supply is included under the specialty medication designation. These would include Actemra, Advate, Aubagio, Avastin, Benlysta, Betaseron, Botox, Cellcept, Cimzia, Copaxone, Cosentyx, Eloctate, Enbrel, Entyvio, Epclusa, Eylea, Fasenra, Forteo, Gammagard, Genotropin, Gilenya, Glatopa, Harvoni, HP Acthar, Hizentra, Humatrope, Humira, Imbruvica, Inflectra, Jakafi, Kisqali, Lupron Depot, Mekinist, Ocrevus, Omnitrope, Orencia, Otezla, Pomalyst, Pulmozyme, Rebif, Remicade, Renvoq, Revlimid, Simponi, Skyrizi, Sprycel, Stelara, Taltz, Tecfidera, Trikafta, Tysabri, Vumerity, Xeljanz, Xolair, and MANY, MANY More!!

129.    On information and belief, the list of Plaintiffs' (or their subsidiaries'

or related companies') branded medicines imported by SHARx extends much

further.

130.    Indeed, as advertised in the above, SHARx covers "[a]ny medication

that is high complexity, high touch and usually over $1000 for a 30-day supply,"

including not only the listed medicines, but "MANY, MANY More!!"[15]

131.    However, SHARx does not actually procure the branded U.S.

medicines that it advertises.

132.    Instead, SHARx employs the following scheme to procure the

delivery of materially different Canadian medicines in lieu of patients' prescribed

U.S. medicines.

---

[15] *Id.*

133. *First*, SHARx solicits new customers by marketing to employers that it will reduce their costs for specialty and high-cost drugs and by encouraging patients to "talk to your benefits provider about SHARx."[16]

134. *Second*, on information and belief, once a new employer joins SHARx's program, SHARx works with the employer to create a sham specialty or high-cost drug "carve-out" from the employer's health plan that excludes certain medicines from the pharmacy benefits of the employer's health insurance plan.

135. *Third*, this allows third-party administrators of employer-funded health benefit and pharmacy benefit plans to deny coverage for prescriptions of branded medicines and instead employ companies like SHARx to procure substitute medicines through international sourcing.

136. *Fourth*, where other alternative funding options are unavailable, SHARx sources the specialty drugs via the importation of unauthorized, materially different foreign medicines.

137. *Fifth*, SHARx communicates to patients that it will help arrange for the fulfillment of their prescriptions of name brand U.S. medications.

---

[16] *Unfettered Care*, SHARx, https://sharxplan.com/members/ (last visited Jan. 28, 2026).

138.   For example, as depicted above, SHARx explains in the patient guides that it will "provide access for all specialty medications," such as "Xolair, and MANY, MANY More!!"[17]

139.   As another example, SHARx states in patient introductory videos that "most name brand medications will now be accessed through SHARx, usually at zero cost to you."[18]



most name-brand medications will now be accessed through sharks usually at

140.   SHARx then claims that the participants will receive those same prescribed medicines through the mail.[19]

---

[17] *See, e.g.*, *Health Benefits 2026 Enrollment Guide*, *supra* note 14, at 10.

[18] *Introducing SHARx to Employees*, YouTube (Dec. 20, 2019), https://www.youtube.com/watch?v=sEcm1S3GuHI.

[19] *Id.*



141. SHARx does not explain that, instead of sourcing the branded FDA-approved U.S. medicines prescribed to the patients, it will procure foreign medicines that have not been reviewed or approved by the FDA and are imported into the United States outside of strictly controlled supply channels.

142. *Sixth*, once a patient has informed SHARx of a specific prescription, SHARx sends the patient's medical provider a "Prescription Request from SHARx Mail Order Program."

143. This form identifies the specific prescription (*e.g.*, "Xolair - 90 day supply with 3 refills") and instructs the medical provider to "Please send an e-prescription to" one of SHARx's partner pharmacies (*e.g.*, "University Pharmacy, Coral Gables, FL 33134").



144. *Seventh*, on information and belief, SHARx's partner pharmacies, such as University Pharmacy in Coral Gables, Florida, then places an order from a foreign pharmacy for a foreign version of the prescribed U.S. medicine.

145. On information and belief, SHARx utilizes a U.S. partner pharmacy as a middleman instead of having the prescription sent direct to the foreign pharmacy to create a veil of legitimacy. Because a licensed U.S. pharmacy has access to the electronic prescription networks through which U.S. healthcare providers transmit patient prescriptions, when healthcare providers submit to them an electronic prescription, the healthcare providers are under the impression that the prescription will be fulfilled by a domestic pharmacy that is subject to federal and state regulations related to pharmacy operation and pharmaceutical supply chains, including the Drug Supply Chain Security Act.

146. *Eighth*, the foreign pharmacy then ships the foreign medicine directly to the U.S. patient or his or her healthcare provider. Notably, there is no mechanism that would ensure that the foreign pharmacy fills the prescription with a medicine from its own country. For example, a Canadian pharmacy could,

instead of filling a prescription with a Canadian drug, instead obtain a gray market version of that drug from, say, Turkey. Such a drug may lack any pedigree that could establish the authenticity of the product, introducing additional opportunities for counterfeit drugs to enter the United States.

147. In the Michigan Incidents, stickering added to the Canadian labeling of the samples received from the medical practices reveal that they were sourced from Defendant Campbell Heights Pharmacy.



148. It is not immediately transparent how Campbell Heights and/or SHARx facilitates the delivery from the dispensing Canadian pharmacy to the U.S. patients and medical professionals.

149. That said, in a recent delivery received by the Royal Oak practice, the package containing the Canadian Xolair® medicine arrived via a shipment from Portland, Oregon, from the shipper "RESHIP US LOGISTICS SERVICE INC.,

13820 NE Airport Way, Portland, OR 97251." That address is the Portland location of the business Reship.[20]

150. Notably, Reship's terms and conditions prohibit the cross-border shipment of pharmaceuticals: "**Cross Border pharmaceuticals** are prohibited."[21]

151. Throughout this multi-stage process, many, if not all, patients are unaware that the medicines they will receive are foreign medicines that have not been reviewed or approved by the FDA, are materially different from their U.S. counterpart and are not subject to the manufacturer and distributor's strict quality control measures intended for U.S. product.

152. Therefore, the importation, distribution and sale of the Canadian Xolair® medicine in the United States is, *inter alia,* an act of trademark infringement.

153. This unlawful scheme has resulted, and will inevitably continue to result, in confusion and concern among patients, physicians and others in the medical profession.

---

[20] *See About Us*, RESHIP, https://www.reship.com/about (last visited Jan. 28, 2026).

[21] *Terms & Conditions*, RESHIP, https://www.reship.com/terms-and-conditions (last visited Jan. 28, 2026).

154. Defendants' unlawful conduct is also likely to expose patients to unnecessary risks by circumventing Plaintiffs' high-level quality-control procedures.

155. On information and belief, unless enjoined by this Court, Defendants will continue their unlawful passing-off scheme, in violation of Plaintiffs' rights.

156. On information and belief, unless enjoined by this Court, Defendants' unlawful conduct will continue to cause confusion, mistake, and deception, and to infringe Plaintiffs' exclusive rights in their trademarks.

## CLAIM I

### Trademark Infringement Under 15 U.S.C. § 1114
### (Against All Defendants)

157. Plaintiffs incorporate paragraphs 1 through 156.

158. Defendants' use of the XOLAIR Marks in commerce in connection with the provision of pharmaceutical preparations which are materially different from U.S. Xolair® medicine is likely to cause confusion, mistake, and deception as to the source of those goods or as to the affiliation, connection, or association of those goods with Plaintiffs, in violation of 15 U.S.C. § 1114.

159. Defendants have passed off the Canadian Xolair® medicine as the U.S. Xolair® medicine.

160. Defendant SHARx's conduct, as described above, constitutes direct and/or contributory trademark infringement.

46

161.   Defendant Campbell Heights Pharmacy's conduct, as described above, constitutes direct trademark infringement.

162.   On information and belief, Defendants' unlawful conduct as set forth herein has been and continues to be willful, deliberate, and in bad faith.

163.   As a result of Defendants' infringement, Plaintiffs have suffered harm from the continuing loss of goodwill and reputation established by Plaintiffs.

164.   On information and belief, Defendants have received revenues and profits as a result of its infringing use of the XOLAIR Marks, to which Defendants are not entitled.

165.   Plaintiffs' continuing loss of goodwill constitutes irreparable harm and an injury for which Plaintiffs have no adequate remedy at law.

166.   Unless enjoined, Defendants will continue the infringing use of the XOLAIR Marks, further injuring Plaintiffs and confusing the public.

## CLAIM II

### Trademark Infringement, Federal False Designation of Origin, and Unfair Competition Under 15 U.S.C. § 1125(a) (Against All Defendants)

167.   Plaintiffs incorporate paragraphs 1 through 166.

168.   Defendants have willfully and deliberately attempted to trade on the goodwill and reputation of Plaintiffs and the XOLAIR Marks and to confuse

47

consumers as to the origin and sponsorship of Defendants' materially different goods, making them seem as those of Plaintiffs.

169.   Defendants' acts deprive Plaintiffs of the ability to control consumer perception of their goods and services offered under their marks placing the valuable goodwill and reputation of Plaintiffs and the XOLAIR Marks into the hands of Defendants.

170.   Defendants' conduct is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants or their marks or offerings with Plaintiffs or their marks and offerings, and as to the origin, sponsorship, or approval of Defendants' offerings, in violation of 15 U.S.C. § 1125(a).

171.   Defendant SHARx's conduct, as described above, constitutes direct and/or contributory trademark infringement, false designation of origin, and unfair competition.

172.   Defendant Campbell Heights Pharmacy's conduct, as described above, constitutes direct trademark infringement, false designation of origin, and unfair competition.

173.   On information and belief, Defendants have received revenues and profits as a result of its infringing use of the XOLAIR Marks, to which Defendants

are not entitled, and Plaintiffs have also suffered harm as a result of the infringing use of the XOLAIR Marks, for which Defendants are responsible.

174.   Defendants' violation of this statute has caused and will continue to cause irreparable harm to Plaintiffs, for which Plaintiffs have no adequate remedy at law.

175.   Unless enjoined, Defendants will continue the infringing use of Plaintiffs' marks, further injuring Plaintiffs and confusing the public.

## CLAIM III

### Importation of Goods Bearing Infringing Marks
### Under 15 U.S.C. § 1124
### (Against Campbell Heights Pharmacy)

176.   Plaintiffs incorporate paragraphs 1 through 175.

177.   Defendant Campbell Heights Pharmacy's importation into the United States of materially different Xolair® medicine from foreign countries infringes Plaintiffs' rights in the XOLAIR Marks and violates 15 U.S.C. § 1124.

178.   Defendant Campbell Heights Pharmacy's conduct, as described above, constitutes direct importation of goods bearing infringing marks into the United States.

179.   Defendant Campbell Heights Pharmacy's acts have harmed and, unless enjoined, will continue to harm Plaintiffs.  Defendant has profited through its unlawful acts and caused harm to Plaintiffs' reputation and goodwill.  Because

this harm causes irreparable injury that cannot be adequately calculated or compensated by money damages, Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116.

## CLAIM IV

### Deceptive and Unfair Trade Practices Under
### M.C.L.A. §§ 445.903, 445.911
### (Against All Defendants)

180.   Plaintiffs incorporate paragraphs 1 through 179.

181.   Defendants' infringing use of the XOLAIR Marks constitutes unfair methods of competition and unconscionable, deceptive, and unfair acts and practices in violation of M.C.L.A. §§ 445.903, 445.911.

182.   Specifically, Defendants' acts cause a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services; constitute representations that Defendants' materially different goods have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have; and constitute representations that Defendants' goods and services are of a particular standard, quality, or grade when they are not, all in violation of M.C.L.A. § 445.903(1)(a), (c), and (e).

183.   Defendant SHARx's conduct, as described above, constitutes direct and/or contributory deceptive and unfair trade practices.

184.    Defendant Campbell Heights Pharmacy's conduct, as described above, constitutes direct deceptive and unfair trade practices.

185.    By reason of Defendants' acts, Plaintiffs have suffered loss and are entitled to monetary and injunctive relief in accordance with M.C.L.A. § 445.911.

## CLAIM V

### Unfair Competition Under Common Law
### (Against All Defendants)

186.    Plaintiffs incorporate paragraphs 1 through 185.

187.    Defendants have willfully and deliberately exploited the XOLAIR Marks and Plaintiffs' goodwill and reputation.

188.    Defendant SHARx's conduct, as described above, constitutes direct and/or contributory unfair competition.

189.    Defendant Campbell Heights Pharmacy's conduct, as described above, constitutes direct unfair competition.

190.    Defendants' acts have caused Plaintiffs to suffer harm to the goodwill associated with the XOLAIR Marks.

191.    Defendants' acts have irreparably harmed and, if not enjoined, will continue to irreparably harm Plaintiffs and the XOLAIR Marks.

192.    Defendants' acts have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

193.    By reason of Defendants' acts, Plaintiffs' remedies at law are not adequate to compensate for the injuries inflicted by Defendants.

## CLAIM VI

### Unjust Enrichment
### (Against All Defendants)

194.    Plaintiffs incorporate paragraphs 1 through 193.

195.    Defendants intentionally used, without authorization or license, the XOLAIR Marks in their unlawful scheme to import the Canadian Xolair® medicine.

196.    As a result of the importation of the Canadian Xolair® medicine, Defendants wrongfully derived a monetary benefit to which they were not legally entitled.

197.    Defendant SHARx is compensated for sourcing the Canadian Xolair® medicine that it causes to be imported from Canada as part of its conspiracy with Campbell Heights Pharmacy and others.

198.    Defendant Campbell Heights Pharmacy is compensated for the Canadian Xolair® medicine that they cause to be imported to the United States from Canada.

199.    Defendants have no right to retain these unjust gains, which they had and have full knowledge and understanding were unjust, improper, and unlawful.

200.   It would be inequitable to allow Defendants to keep the unjust monetary benefits that they have knowingly reaped from their importation of the Canadian Xolair® medicine.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor on all claims of this Complaint and grant Plaintiffs the following relief:

1.   Enjoin and restrain Defendants and their agents, servants, employees, subsidiaries, parents, affiliates, members, directors, officers, and attorneys, and any persons in active concert or participation with any of them:

      a. from importing, advertising the importation of, or otherwise facilitating the importation of goods bearing any of the XOLAIR Marks;

      b. from purchasing, selling, distributing, marketing, manufacturing, offering for sale, or otherwise commercializing in United States commerce, any good bearing any of the XOLAIR Marks that was not intended for sale in the United States;

      c. from importing, advertising the importation of, or otherwise facilitating the importation of non-U.S. Genentech- or Novartis-branded medicine;

      d.  from falsely representing Defendants as being connected with Plaintiffs or sponsored by or associated with Plaintiffs with respect to the importation of non-U.S. Genentech- or Novartis-branded medicine, or engaging in any act (including using the XOLAIR Marks or any marks confusingly similar to the XOLAIR Marks) which is likely to cause the trade, retailers, or members of the purchasing public to believe that Defendants are associated with Plaintiffs with respect to the importation of non-U.S. Genentech- or Novartis-branded medicine;

      e.  from destroying any records concerning the direct or indirect sale, offer for sale, accounting, distribution, advertisement, exportation, importation, prescription, shipment, transportation, or receipt of any non-U.S. product or product dispensed by a non-U.S. pharmacy purporting to be a Genentech or Novartis medicine;

      f.  from assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (e) above;

2.    requiring Defendants to file with the Court and serve on Plaintiffs, within 30 days after entry of an injunction, a report in writing, under oath, setting forth the manner and form in which Defendants have complied with the injunction;

3.      awarding to Plaintiffs an accounting and disgorgement of Defendants' ill-gotten profits;

4.      awarding to Plaintiffs their costs;

5.      awarding to Plaintiffs their reasonable attorney fees;

6.      awarding to Plaintiffs any and all pre-judgment and post-judgment interest; and

7.      awarding such other and further relief as the Court deems just, proper, and equitable.

Dated:  February 2, 2026          Respectfully submitted,

Miller, Canfield, Paddock and Stone, PLC

By:   */s/Thomas W. Cranmer*
        Thomas W. Cranmer (P25252)
        Matthew P. Allen (P57914)
        840 W. Long Lake Rd., Ste. 150
        Troy, MI 48098
        (248) 267-3290
        cranmer@millercanfield.com
        allen@millercanfield.com

        ***Attorneys for Plaintiffs Genentech, Inc. and Novartis AG***

        Michael X. Imbroscio
        Robert N. Hunziker
        Covington & Burling LLP
        One CityCenter
        850 Tenth Street, NW
        Washington, DC 20001
        (202) 662-6000

mimbroscio@cov.com
rhunziker@cov.com

Khala James
(admissions application pending)
Covington & Burling LLP
Salesforce Tower
415 Mission Street
Suite 5400
San Francisco, CA 94105
(415) 591-6000
kjames@cov.com

***Attorneys for Plaintiff Genentech, Inc.***

Anna Kurian Shaw
(admissions application pending)
Carrie DeLone
(admissions application pending)
Lauren Cury
(admissions application pending)
Hadley Dreibelbis
(admissions application pending)
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5710
anna.shaw@hoganlovells.com
carrie.delone@hoganlovells.com
lauren.cury@hoganlovells.com
hadley.dreibelbis@hoganlovells.com

***Attorneys for Plaintiff Novartis AG***

45519847.6/132787.00004